**EGGLESON et al. v. McCASLAND et al.**

**Civ. No. 2813.**

United States District Court,
E. D. Oklahoma.

June 29, 1951.

Ben F. Saye, Duncan, Okl., for plaintiffs.

Brown, Cund & Brown, Duncan, Okl., for defendants.

694

WALLACE, District Judge.

This is an action brought in the United States District Court for the Eastern District of Oklahoma, to have an oil and gas lease cancelled of record, for a judicial determination that said lease has terminated, and to permanently enjoin the defendants from exercising or attempting to exercise any right or interest thereunder. Plaintiffs are all citizens of the State of Missouri, the defendant, T. H. McCasland, is a citizen of the State of Oklahoma, and the defendant, Twin Oil Corporation, is a corporation organized under the laws of the State of Texas, duly authorized to do business in the State of Oklahoma. The sum or value in controversy exceeds, exclusive of interest and costs, the amount of $3,000.

On September 22, 1936, Eddy and Minnie Eggleson, being the fee holders of the surface and mineral estates of the lands involved in this controversy, executed an oil and gas lease thereon to L. R. Baker. Among other things, it was provided in the lease: " * * * that this lease shall remain in force for a term of seven (7) years from this date and as long thereafter as oil or gas or either of them is produced from said land by lessee."

Baker assigned this lease to defendant McCasland on June 24, 1937. Through various mesne assignments the defendant, Twin Oil Corporation, became owner of an undivided one-half interest in said lease. Plaintiffs Amy Berry and Otis Eggleson are holders of the fee title in the mineral estate of said lands subject to the lease now held by defendants. Subsequent to these various conveyances and assignments, Eddy Eggleson died, leaving Minnie Eggleson the sole lessor under the lease.

Approximately August 31, 1943, defendants began to drill a well upon the Eggleson lease, completing it as a gas well on September 11, 1943. The well possessed a potential capacity of 11,000,000 cubic feet per day at a rock pressure of 550 pounds per square inch.

With the exception of small sales to parties drilling wells within that area, no gas was marketed and the well was shut in.

The royalties received by the plaintiff resulting from these sales were paid as follows:

| | |
|---|---:|
| December 4, 1945 | $ 60.00 |
| September 25, 1946 | 150.21 |
| August 6, 1948 | 31.25 |
| Total | $241.46 |

Another royalty payment of $179.77 for gas sold in October, November, and December of 1950 was tendered to plaintiffs, but it was refused. Plaintiffs allege that this failure to produce and market gas from the well terminated the lease, by its own terms, on September 22, 1943.

On May 21, 1947, plaintiffs served notice on McCasland to further develop or surrender the lease. In compliance with this notice, defendants began drilling a second well which was completed on February 6, 1948, as a dry hole. A third well was completed by the defendants on August 22, 1949, but this was also a dry hole.

Upon the failure of defendants to continue production from the gas well, plaintiffs served notice on the defendants to terminate their tenancy and remove from the premises. Defendants refused and this action followed.

At the time that the first well was drilled, the only common carrier of gas in that area was the Lone Star Gas Company, which had a pipe line some five or six miles distant. McCasland contacted the company and sought to have it purchase the gas and then transport it from the well to the pipe line. However, Lone Star declined because of the distance and the expense of laying pipe to the well. Defendants also declined to lay the pipe from the well to the Lone Star line because it was not financially sound. The estimated expense of laying the pipe and providing the pumping equipment was $80,000 to $100,000. However, defendants continued to drill wells in the nearby area, although not on the Eggleson lease, in order to fully develop that area, create a market for the gas, and to induce other carriers to lay a pipe line to that area and purchase the gas. In fact, although not as a result of the development of the area by the defendants, Oklahoma Natural Gas

Company began preparations for the laying of a pipe line within one-half to one mile from the Eggleson gas well. It was estimated that the line would be completed approximately 60 days after the termination of this action. In such event, it was estimated that the cost of laying a line from the well to the main transmission line of the Oklahoma Natural would be $1 per foot. Such an investment would be financially sound. While such was not the original purpose of the Oklahoma Natural in laying the line, there was testimony from one of its officers that it would purchase the gas of any wells along the route of the pipe line if such gas could meet the general contract requirements of the company.

Generally, even in the absence of an express covenant to produce and market, there is an implied covenant that the lessee will do so. Wolfe v. Texas Company, 10 Cir., 83 F.2d 425; Pelham Petroleum Co. v. North, 78 Okl. 39, 188 P. 1069; Strange v. Hicks, 78 Okl. 1, 188 P. 347. In this lease there is an express covenant to produce, and the covenant to market will be implied. Failure to comply with these covenants will result in a termination of the lease, even though production was once had, but has been subsequently concluded. Continental Oil Co. v. Osage Oil & Refining Co., 10 Cir., 69 F.2d 19; United States v. Brown, D.C.Okl., 15 F.2d 565. However, there is a limitation placed upon this rule and covenants to produce and market gas after it is discovered, whether express or implied, do not require the lessee to so market the product in every instance. Saulsbury Oil Co. v. Phillips Petroleum Company, 10 Cir., 142 F.2d 27; Stimson v. Tarrant, D.C. Mont., 43 F.Supp. 657; Strange v. Hicks, supra. Where the operator is unable to market the product because of the lack of an available market or of pipe line connections, no forfeiture or termination of the lease results if the operator exercises due diligence to overcome the difficulties. Christianson v. Champlin Refining Co., 10 Cir., 169 F.2d 207; Saulsbury Oil Co. v. Phillips Petroleum Company, supra; Stimson v. Tarrant, supra (lack of market); Strange v. Hicks, supra. Due diligence is construed to mean whatever, under the circumstances, would be reasonably expected of operators of ordinary prudence. Denker v. Mid-Continent Petroleum Corp., 10 Cir., 56 F.2d 725; Allen v. Palmer, 201 Okl. 673, 209 P.2d 502; Robinson v. Miracle, 146 Okl. 31, 293 P. 211; Pelham Petroleum Co. v. North, supra. Among the factors to be considered by the court in determining if the lessee has acted as a reasonably prudent operator are: the availability of a market, means of transportation, the availability of pipe lines, and the cost involved in transporting the product to the nearest available market. Stanolind Oil & Gas Co. v. Kimmel, 10 Cir., 68 F.2d 520.

The case of Strange v. Hicks, 78 Okl. 1, 188 P. 347, 349, is applicable to the facts of this controversy. In that case, the lease was for a fixed term of two years and "as long thereafter as oil or gas or either of them is produced from said land * * *." The lessee failed to continue production after the initial discovery because he was unable to obtain a market for the gas. At that time the United States was engaged in war with Germany, and those who would have purchased the gas were unable to obtain the necessary pipe to lay a line to the wells. The lessee tried diligently to acquire a market, but being unable to do so, he proceeded to drill other wells in the vicinity, for the purpose of developing the area and to obtain sufficient gas to justify the construction of a pipe line to the field. The plaintiff lessors contended that as a result of the failure to produce, the lease terminated by its own terms. The Oklahoma court declared that the lessee had exercised due diligence and held that the lease had not terminated.

In the case at bar, defendants have been unable to find a market for the gas on the Eggleson lease. Even if it had been financially sound to expend $80,000 in constructing a pipe line to the transmission line of the Lone Star Company, it is doubtful that such pipe could have been obtained, due to the fact that the United States was engaged in World War II during a large period of this time. However, it was not financially sound, and, according to expert testimony, a reasonably prudent operator would not have made such an expenditure. Although

696

defendants could not obtain a market for the gas on the Eggleson lease, they did make two further attempts to develop the lease, both of which resulted in dry holes. In addition, defendants expended in excess of $800,000 in developing the general area in which the Eggleson lease was located, in the hope that it could create a market for the gas existing in that area. Now, after abundant difficulties and delays, there will be an available market whereby defendants can produce and sell the gas on the Eggleson lease.

 Plaintiffs have alleged that the lease terminated on September 22, 1943. Yet they have received royalty payments since that date, they have required the defendants to drill additional wells upon the lease, and they have been made cognizant of the pipe line difficulties without indicating to the defendants at any time that they had considered the lease terminated on September 22, 1943. While this court realizes that the mere acceptance of royalties will not deny the lessor his right to termination, yet when viewed in connection with their other acts, we believe them to be conclusive. Plaintiffs have been fully aware of the defendants' intentions to expend, and their actual expenditures upon the lease for a long period after September 22, 1943, and yet they have never indicated to the defendants that they considered this lease to have terminated. As was stated in Strange v. Hicks, supra, 188 P. at page 351: "We do not believe that the plaintiffs come into court with clean hands. By acquiescing in the acts of the lessees in the development of this field, and making no claim that the lease was forfeited, but by every act of theirs indicating the lease was in full force and effect, they obtained an advantage which they sought to capitalize at the expense of the lessees."

This court will not deprive the defendants of the benefits of their lease, since it has been shown that they operated with due diligence and as a reasonably prudent operator would proceed under the circumstances. However, in consideration of the statements and offers made by defendants on trial, we will require the defendants to resume production and obtain a market under the terms of the lease within 60 days after the completion of the pipe line now being laid by the Oklahoma Natural Gas Company; or, if said line is not completed within 60 days from date of this opinion, to further develop the lease by drilling an additional well within 120 days from date of this opinion.

Counsel are directed to submit a journal entry in conformity with this opinion within ten days from this date.