**R. A. BRISTOL and Ralph A. Bristol, Trustee, Plaintiffs,**

**v.**

**COLORADO OIL AND GAS CORPORATION, a corporation, and Colorado Interstate Gas Company, a corporation, Defendants.**

**COLORADO OIL AND GAS CORPORATION, a corporation, and Colorado Interstate Gas Company, a corporation, Plaintiffs,**

**v.**

**Quintin LITTLE, Defendant.**

**Civ. Nos. 5991, 6057.**

United States District Court
W. D. Oklahoma.

June 1, 1954.

Donley C. Wertz, Dallas, Tex., Fisher Ames, Oklahoma City, Okl., for R. A. Bristol and another.

Lewis M. Poe, Colorado Springs, Colo., Lynn Adams, Oklahoma City, Okl., for Colorado Oil & Gas Corp. and another.

J. I. Goins, Ardmore, Okl., for Quintin Little.

VAUGHT, Chief Judge.

In Cause Number 5991, plaintiffs seek to cancel an oil and gas lease and to quiet title to an undivided %₂nds interest in the mineral in and under the following described lands in Cimarron County, Oklahoma: South Half of Section 16, Township 5 North, Range 8 East of the Cimarron Meridian, and for an accounting for the gas taken therefrom.

In Cause Number 6057, the plaintiffs file a declaratory judgment action against Quintin Little, who owns an undivided ⅟₁₆ interest in the minerals in and under the lands above-described, to determine the validity of the oil and gas lease.

Both cases will be determined by the same applicable facts and the principal question involved is whether or not the lease in question is now in full force and effect, or whether it lapsed or was forfeited because of the failure of the lessee to market gas from said premises.

On March 11, 1940, Robert E. Cox executed a five-year oil and gas lease covering the land above described. The lease was shortly thereafter assigned to The Pure Oil Company (hereinafter referred to as Pure Oil). During the year 1942, R. A. Bristol, Ralph A. Bristol, Trustee, and Quintin Little acquired interests in and to the minerals lying in and under said lands which minerals were subject to said oil and gas lease. On December 13, 1942, Pure Oil commenced drilling of a well on the above described land and continued drilling operations until said well was completed as a commercial gas producer on May 9, 1943, having a potential capacity of 19,000,000 cubic feet of gas per day. Upon the completion of the well it was found there was no market for the gas and the well was shut in. Throughout the primary five-year term of said lease, the

delay rentals were paid annually to and accepted by all the mineral owners.

On December 22, 1944, all record owners of minerals in and under the captioned land were requested by Pure Oil to sign a certain agreement providing for shut-in royalties on the non-utilized gas, and again on February 1, 1946, a similar request was made to all mineral owners. All mineral owners of record, except the Bristols and Little, executed said agreement. Pure Oil continued to pay delay rentals to all parties including the Bristols and Little. The Bristols received and retained said rentals until February 15, 1952, when they returned said checks. Little returned his checks for the payments made in 1951 and 1952.

On July 2, 1952, Pure Oil sold and transferred said oil and gas lease to the Colorado Oil and Gas Corporation (hereinafter referred to as Colorado Oil), which connected a gas transmission line to said well on November 1, 1952, and produced gas therefrom during the months of November and December, 1952. On January 1, 1953, Colorado Oil sold the lease to the Colorado Interstate Gas Company (hereinafter referred to as Colorado Interstate), which is now the owner and holder thereof and is producing gas therefrom.

When the well was brought in, an analysis of the gas showed it had a high nitrogen content—28% or 29%, and a low B.T.U. content of 800 B.T.U. The well was a wildcat well and was the first one drilled in the Keyes Field. Pure Oil continued to drill in the area, and by June, 1946, had three other gas wells on nearby acreage.

The contention of the Bristols and Little is that the operator failed to exercise due diligence in finding a market for said gas. The contention of Colorado Interstate and its predecessors in ownership is that they exercised all reasonable diligence in attempting to find a market for the gas. The testimony of the gas company is to the effect that it contacted various prospective purchasers of gas, both in an effort to sell the gas or even to sell the lease if a proper purchaser could be found, but to no avail.

In 1951 Colorado Interstate built a large 20-inch transmission line from the Texas Panhandle to Colorado, which supplied natural gas to Denver. This line was six and one-half miles from the Cox lease. In July, 1952, Colorado Interstate secured permission to build a 10-inch line from its large 20-inch line to the Cox well. This 10-inch line was completed and the Cox well was placed on production in November, 1952.

There were no transmission lines into the Keyes Field (on which the Cox well was located), prior to the construction of the Colorado Interstate line in 1951, and under the evidence there was no drainage of gas from the field. At that time the Hugoton Field more than twenty miles away was the nearest gas field from which gas was being sold commercially, and gas was then selling from $3\frac{1}{2}$¢ to 4¢ per MCF. For the months of November and December, 1952, Colorado Oil settled with the mineral owners for their royalty on a basis of $7\frac{1}{2}$¢ per MCF. In 1953, Colorado Interstate settled with the mineral owners for their royalty on a basis of approximately 8¢ per MCF. At the present time Colorado Interstate is settling with the mineral owners for their royalty on the basis of 15¢ per MCF, adjusted for the B.T.U. content, which nets the mineral owners under the Cox well 12¢ per MCF.

There were two reasons given by Colorado Interstate and its predecessors for their failure to find a purchaser for the gas from the Cox well. One, was the inaccessibility of the well. To have constructed a pipe line would have been an expensive operation, not justified by the production from the well. Second, was the peculiar content of this gas. It could not be utilized in its natural form, and the reason why Colorado Interstate could utilize it, was, it mixed it with gas produced from other fields and carried through its 20-inch pipe line to Denver.

The question here is whether or not Pure Oil exercised reasonable diligence and judgment in attempting to find a purchaser. Under the evidence the following companies were contacted in an effort to dispose of this gas: Peerless

Oil and Gas Company; Ohio Fuel Supply Company; W. C. Taggart; Great Lakes Carbon Corporation; Colorado Interstate Gas Company; Sunflower Natural Gas Company; Permanente Metals Corporation; Husky Refining Company; Ideal Cement Company; Emby Kaye; Reynolds Metal Company; Texhoma Natural Gas Company; Southwestern Public Service Company; Colorado Fuel & Iron Corporation; Columbia Carbon Company; Consolidated Gas Company; Oklahoma Natural Gas Company; Northern Natural Gas Company; J. M. Huber Corporation; Shamrock Oil and Gas Company; Witco Carbon Company; Cabot Carbon Company; Cities Service Oil Company; Phillips Petroleum Company; Standard Oil and Gas Company; Helmerich & Payne, Inc.; Kerr-McGee Industries, Inc.; Sunray Oil Company; El Paso Natural Gas Company; Eastern Pipe Line Company; United Carbon Company; Hegge, Harrington & Marsh; and George Swan.

It appears from the record that in all these numerous contacts Pure Oil was unable to interest anyone in purchasing the gas from the Cox well. The reasons given by W. M. Peck, manager of Pure Oil, in his deposition, were as follows:

"In a general expression, skepticism regarding the reserve in the light of no facts at that time, or assumed facts, based on no data available at that time but due to the low B.T.U. value, the high nitrogen content, the inability to, or prospect of being able to, utilize the gas, the cost of transporting the gas volume that was one-third inert gas; the high cost of making any attempt to denitrogenizing the gas. In fact, within my personal knowledge, there is no satisfactory or economic way to denitrogenize the gas."

From 1949 until the sale of the leases in 1952 to Colorado Interstate, obtaining a market for the gas from this well was uppermost in the mind of Mr. Peck, quoting from his deposition further:

"  *   *   * Throughout all of this period from 1947 almost upon the advent of my arrival here, I sincerely made every effort in the world to engage some means to dispose of gas. We entered into our deliberations from every angle, namely, that somebody build a line into it, which we are not in a position to do, certainly; that we try to interest some one in taking over the entire property with the idea of developing it further in the hope of attempting to establish a sufficient reserve that would substantiate the economic feasibility of laying lines into the field to gather and transport gas. We attempted to interest people in developing further for oil; further for gas. We attempted to get people interested in furnishing a market and, if successful, we would undertake certain additional developments. We attempted to farm out portions of the acreage in the hopes that, what we then construed as possibly no production of gas or oil, might, as these things have a way of happening, surprise every one and be productive despite geological interpretations and appraisals, based on good factual data. And, I will say to date, and I don't think much of that factual data has been contradicted. I don't know of a thing we could have done further."

The duty of the lessee to market the gas, as contended by the gas company, quoting from Summers on Oil and Gas, Volume 3, paragraph 415, is as follows:

"But whether this duty to market be expressed in general terms, or implied, the performance thereof must be tested by what amounts to reasonable diligence under all the facts and circumstances in a particular situation."

In Denker v. Mid-Continent Petroleum Corporation, 10 Cir., 56 F.2d 725, 727, Judge Phillips states in his opinion:

"  *   *   * a lessee must do that which, under the circumstances, an operator of ordinary prudence, having regard for both lessor and lessee, would do.  *   *   *"

Under very similar circumstances as exist in the case at bar, the Oklahoma Supreme Court in Strange v. Hicks, 78 Okl. 1, 188 P. 347, refused to grant lessors forfeiture of the lease for nondevelopment and nonmarketing of the gas.

In Eggleson v. McCasland, 98 F.Supp. 693, 695, Judge Wallace, of the Eastern District of Oklahoma, had a somewhat similar situation and in his opinion states:

"\* \* \* Where the operator is unable to market the product because of the lack of an available market or of pipe line connections, no forfeiture or termination of the lease results if the operator exercises due diligence to overcome the difficulties. Christianson v. Champlin Refining Co., 10 Cir., 169 F.2d 207; Saulsbury Oil Co. v. Phillips Petroleum Company, supra [10 Cir., 142 F.2d 27]; Stimson v. Tarrant, supra [D.C.Mont., 43 F.Supp. 657] (lack of market); Strange v. Hicks, supra [78 Okl. 1, 188 P. 347]. Due diligence is construed to mean whatever, under the circumstances, would be reasonably expected of operators of ordinary prudence. (Citing authorities.) Among the factors to be considered by the court in determining if the lessee has acted as a reasonably prudent operator are: the availability of a market, means of transportation, the availability of pipe lines, and the cost involved in transporting the product to the nearest available market. Stanolind Oil & Gas Co. v. Kimmel, 10 Cir., 68 F.2d 520."

In Christianson v. Champlin Refining Company, 10 Cir., 169 F.2d 207, 209, in an almost identical case, the court refused to cancel a lease because of inability of the operator to connect a producing gas well to a pipe line and thus market the gas, and in the opinion Judge Huxman stated:

"The general rule is that where production results from drilling operations and the operator is unable to market the product immediately on account of lack of an available market or of pipe line connections, no forfeiture results if, by the exercise of due diligence on the part of the operator, the well is equipped and a market is obtained within a reasonable time.

\* \* \* \* \* \*

"It is implied in the very nature of the oil business that a reasonable time must intervene between the completion of the drilling operations resulting in production and the ability to market and sell the product of a well. What constitutes a reasonable time, of necessity, depends upon the circumstances surrounding the drilling of each well. Thus, a wildcat well, a considerable distance from pipe line connections and markets, cannot be actually produced in the sense that the product is marketed within the same length of time as a well that is close to such facilities. All that is required is that the operator exercise due diligence in equipping the well and in placing it in production. This is the general rule and there is nothing in the Kansas decisions which have come to our attention which would indicate a contrary holding. Certainly the appellees in this case did all that reasonable men could be expected to do. They did secure within a year the construction of an expensive pipe line and made it possible to market the gas which was of an inferior quality, which in itself, entailed additional difficulty, and were actually marketing the gas from the well within fifteen months from the date of its completion."

The reason why Colorado Interstate is able to use the gas from the Cox well is because it takes 150,000 cubic feet per day of the Texas Panhandle gas (which has 1000 B.T.U. content), and blends it with 33,000 cubic feet of gas per day from the Cox well (which has a high nitrogen content of 28% or 29% and 800 B.T.U. content), and gets a gas of 963 B.T.U. content at the Denver gate.

It can hardly be conceived how Pure Oil could have exercised greater effort

to market the gas than it did exercise and there is no apparent reason why Pure Oil would not have been even more interested in marketing this gas than the minor royalty owners. The Bristols the Little together own ⁹⁄₃₂nds of ⅛th of the royalty and they have been treated exactly as the other royalty owners were treated.

An examination of the authorities cited in the briefs filed by counsel for the Bristols and Little did not change this court's interpretation of the rule established by the Supreme Court of Oklahoma and the Court of Appeals for the Tenth Circuit.

It is therefore the conclusion of this court that in Cause Number 5991, judgment should be rendered for the defendants and in Cause Number 6057, judgment should be rendered for the plaintiffs.

Findings of fact, conclusions of law and a form of judgment consistent with this opinion may be submitted within fifteen days from this date.