**R. A. BRISTOL and Ralph A. Bristol, Trustee, Appellants,**

v.

**COLORADO OIL AND GAS CORPORATION, a corporation, and Colorado Interstate Gas Company, a corporation, Appellees.**

**No. 5100.**

United States Court of Appeals
Tenth Circuit.

Aug. 5, 1955.

Fisher Ames, Oklahoma City, Okl., for appellants.

Lynn Adams, Oklahoma City, Okl. (Lewis M. Poe, Colorado Springs, Colo., on the brief), for appellees.

Before HUXMAN, MURRAH and PICKETT, Circuit Judges.

MURRAH, Circuit Judge.

The appellants, lessors of undivided mineral interests in lands in Cimarron County, Oklahoma, brought this suit to cancel the oil and gas lease and quiet their title to their fractional mineral interests, contending that the lease expired by its own terms for failure of the lessees to produce oil or gas therefrom in paying quantities within its primary term. This is an appeal from a judgment denying cancellation and validating the lease. The suit is between citizens of different states and involves the requisite amount in controversy.

The "unless" lease was for a term of five years and as long thereafter as oil or gas or either of them was produced from the said land. During the definite term of the lease a well was drilled and completed capable of producing gas in paying quantities, but because of the unburnable quality of the gas and the absence of any pipe line facilities, the well was capped and no gas sold therefrom until seven and two-thirds years after the expiration of the definite term. During that time the co-tenants of appellants executed annual shut-in royalty agreements and accepted stipulated "rental or royalty". While the appellants refused to execute the shut-in agreements, they did accept their pro rata share of the rentals or royalties for seven years without protest until the year before a pipe line

connection was made, when they refused to accept the proffered payments and later brought this suit to cancel the lease and quiet their title.

Following the general rule announced in Christianson v. Champlin Refining Co., 10 Cir., 169 F.2d 207, the trial court found that the original lessee and its successors exercised extraordinary diligence in their efforts to market the gas after discovery within the primary term, and that when they did finally succeed, the lease had not terminated but continued in full force and effect, and that the mineral interests of the appellants were subject thereto. See Bristol v. Colorado Oil & Gas Corp., D.C., 126 F.Supp. 487.

■ In the Christianson case we stated the general rule to the effect that where production results from drilling operations and the operator is unable to market the production immediately on account of lack of an available market or pipe line connections, no forfeiture results if in the exercise of due diligence on the part of the operator the well is equipped and a market is obtained within a reasonable time. That case involved a Kansas lease, and Kansas has subsequently expressly repudiated the notion that discovery of oil or gas without actual production would operate to extend the lease beyond its definite term. See Tate v. Stanolind Oil & Gas Co., 172 Kan. 351, 240 P.2d 465 and Home Royalty Ass'n, Inc., v. Stone, 10 Cir., 199 F.2d 650. Cf. Freeman v. Magnolia Petroleum Co., 141 Tex. 274, 171 S.W.2d 339. The rule has also been criticized by Professor Summers as an application of "fireside equities" to write a new contract for the parties. See Summers, Oil and Gas, Vol. 2, § 300, Pages 157–8.

■ But this lease is an Oklahoma contract, and the parties apparently agree, at least for the purposes of this case, that under Oklahoma law, actual production within the definite term of the lease is not a condition precedent to the extension of the lease beyond its definite term; that the lessee has a reasonable time to market the gas after discovery and expiration of the definite term of the lease. And see Roach v. Junction Oil & Gas Co., 72 Okl. 213, 179 P. 934; Strange v. Hicks, 78 Okl. 1, 188 P. 347; Parks v. Sinai Oil & Gas Co., 83 Okl. 295, 201 P. 517; Eggleson v. McCasland, D. C., 98 F.Supp. 693. Cf. Skelly Oil Co. v. Wickham, 10 Cir., 202 F.2d 442 and Bain v. Portable Drilling Corp., 200 Okl. 569, 198 P.2d 207.

While accepting the rule as stated, the appellants state the question for decision as whether the gas was marketed within a reasonable time, and relying upon the literal language of the Christianson case, supra, the question is said to be not whether the lessees exercised due diligence under an implied covenant to market, as the trial court reasoned, but whether they discharged "an absolute duty to market within a reasonable time to prevent termination." Otherwise stated in the language of the appellants, the question is "not how hard Pure Oil Company tried to market the gas or sell the lease, but whether it succeeded in marketing the gas within a reasonable time."

■ As a necessary corollary to the beneficent rule which protects lessees from termination or forfeiture for failure to actually produce and market gas discovered within the primary term, the Oklahoma courts have implied a covenant to operate the validated lease in a prudent manner and with reasonable diligence. Strange v. Hicks, supra; Indiana Oil & Gas & Development Co. v. McCrory, 42 Okl. 136, 140 P. 610; Newell v. Phillips Petroleum Co., 10 Cir., 144 F.2d 338; Saulsbury Oil Co. v. Phillips Petroleum Co., 10 Cir., 142 F.2d 27; Wolfe v. Texas Co., 10 Cir., 83 F.2d 425; Summers, Oil and Gas, Vol. 2, § 400. Like implied covenants for exploration and development, the covenant to operate prudently and diligently is based upon considerations of fairness, having regard for the mutual rights and duties of the parties. And where the sole or primary consideration for the lease is the payment of royalties from the production, it is incumbent upon the lessee to make sure that conflicting interests are not weighted against the lessor. See Merrill, Covenants Implied in Oil and

Gas Leases, Second Edition, Sec. 72, and cases cited.

The covenant to operate necessarily embraces a duty to market the production to the mutual advantage of both parties. See Merrill, Sec. 84. But since the "covenant is not to operate absolutely but to operate reasonably and with diligence", Merrill, Sec. 90, the component duty to market must be tempered by the rule of reason and prudence. It follows that in the adjustment of the rights of the parties under the contract, and particularly in determining whether the implied covenants have been kept, we deal not in absolutes but in facts and circumstances, and with rules or criteria flexibly adaptable to the practical exigencies of the case. Trust Co. of Chicago v. Samedan Oil Corp., 10 Cir., 192 F.2d 192. Considered in this light, diligence and reasonable time become related terms in the promulgation of a rule of conduct based upon equitable considerations applicable to particular facts for the adjustment of the rights of the parties to a contract where it speaks only by implication.

While reasonable time and due diligence do not have the same meaning in the application of the rule of reason, they are both essential ingredients of the rule. For reasonable time is measured, in some degree at least, by the diligence with which the lessee attempts to secure a market. And conversely, the reasonableness of the time may influence the question of diligence. This does not mean, however, that reasonable time is unlimited in the face of diligent effort. Indeed, we do not understand the learned trial judge to infer that the lease would endure so long as the lessee can show diligent efforts to market the production. The rule of reason will bring the term to an end some time, regardless of intensity of effort. In determining whether the lease has been forfeited for breach of the covenant to market, equity "will impose a rigid standard of good faith on the part of the lessee", measured in each case not only by the lapse of time, but the diligence of the operator as well. Cf. Phillips Petroleum Co. v. Peterson, 10 Cir., 218 F.2d 926.

We start with the premise that nine and one-half years have elapsed since the completion of the well and seven and two-thirds years since the expiration of the definite term of the lease. During this time the lessors have not received any of the primary consideration for the lease. On its face, and in the very nature of things, this period of time is inordinately long and undoubtedly places the burden upon the lessees to excuse the delay.

They have come forward with these facts. The well was drilled on a large block of leases in "wildcat" territory more than twenty miles from a gas pipe line. There was no demand for the production, hence no available market. Moreover the gas was unsuited for domestic use without blending or treatment. In its effort to find or create a market the original lessee, the Pure Oil Company, contacted all of the companies which might be interested in taking the gas or assuming the lease with its obligations. It drilled a total of fourteen wells on the block, three of which were gas wells, five oil wells, and five dry holes. The original well drilled within the term cost approximately $126,000. Each of the other wells cost approximately $50,000. The Pure Oil Company expended another $100,000 in seismographic exploration. There were no other gas wells in this vicinity connected to a pipe line. There was no drainage. Neither Pure nor its successors received any return on their investment until the pipe line connection in 1952. After the leases were assigned to the Colorado Oil and Gas Corporation, five additional gas wells were drilled and there is some intimation that if Pure had drilled the additional wells with resulting reserves, the availability of the market would have been hastened.

But the facts are that the market was not available until Colorado Interstate Gas Company constructed its twenty-inch pipe line from Texas to Denver from which it extended a ten-inch line to the wells in question after it had acquired the acreage including the producing oil wells. When the connections were finally made and Colorado Interstate

commenced taking the gas and paying the royalties, the market price of the gas had increased from 3½¢ and 4¢ per mcf to 7½¢ per mcf in 1952, 8⅓¢ per mcf in 1953, and at the time of the trial the base price for the gas from these wells yielded the royalty owners 12¢ per mcf.

[6] And it is significant, we think, to note the attitude of the lessors during this long period of delay. The record is barren of any demands upon the lessees to further develop, find a market or release the leases. It seems fair to say that it was not until the pipe line connections were imminent that the lessors sought cancellation. Meanwhile they accepted without protest their prorata part of the payments made as shut-in royalties in lieu of further development or sale. And while the acceptance of these payments without signing the shut-in agreements may not operate strictly as an estoppel or waiver of their rights to insist upon a breach, it is proper, we think, to consider it in the light of all of the other facts and circumstances in the determination of the ultimate question of prudent operation in the light of time and effort. See Stanolind Oil & Gas Co. v. Kimmel, 10 Cir., 68 F.2d 520 and Eggleson v. McCasland, supra. Furthermore, the courts, recognizing the insurmountable problems of storing gas above ground or transporting it without a pipe line, have been prone to "uphold lease extensions where gas is discovered and determined to exist in marketable or paying quantities but for one reason or another cannot be readily produced and marketed." Town of Tome Land Grant, Inc., v. Ringle Development Co., 56 N.M. 101, 240 P.2d 850, 851; Summers Oil and Gas, Vol. 2, § 299.

All of these are practical considerations which enter into and determine the question whether a forfeiture will be decreed. It was these considerations which prompted the trial court to deny forfeiture, and a rightful regard for the findings and conclusions of the chancellor in cases of this kind brings us to an affirmance of his judgment.

HUXMAN, Circuit Judge (dissenting).

I, of course, agree that the answer to our problem must be sought and found in the Oklahoma decisions. For that reason reference will be made only to Oklahoma cases. I, however, cannot agree with my Associates that the Oklahoma decisions compel the conclusions reached by the majority. In fact, to me they indicate that if and when the precise question comes before that court[1] it will not hold as my Associates do herein. Were I not of that view, I would not dissent. Because I am of that view, a somewhat extended analysis of the Oklahoma cases relied upon by the majority will be necessary.

Indiana Oil, Gas & Development Co. v. McCrory, 1914, 42 Okl. 136, 140 P. 610, involved a lease of 15 years with an "as long thereaftér" clause. Wells were drilled during the primary term. During the primary term an action was brought to cancel on the grounds of imprudent, careless, negligent drilling and management of the property. That case did not involve the question of the extension of the lease after the expiration of the primary term. All the court said was that under implied covenants for the development and management of the property neither the lessor nor the lessee is the sole arbiter but a court of equity will view the matter from the standpoint of the interests of both. With that pronouncement we are all in accord.

In Roach v. Junction Oil & Gas Co., 1919, 72 Okl. 213, 179 P. 934, 936, a gas well was drilled during the primary term. The primary term expired January 9, 1916. On October 11, 1915, the well was commenced. On November 3, at a depth of 730 feet a flow of three million cubic feet of gas was encountered. This was cased off and on November 28 at a depth of 1,400 feet a flow of gas from eight to ten million cubic feet

---

1. I can find no Oklahoma case in which the precise question has been decided by the Oklahoma Supreme Court.

was found. This was likewise cased off and drilling operations continued. On December 21 at a depth of 1,900 feet a flow of approximately three million cubic feet was encountered. This was likewise cased off and drilling operations continued. Drilling operations were continued until January 18, 1916, nine days after the expiration of the primary term, when at a depth of 2,600 feet a flow of twelve million feet was encountered. The lease provided payment to the lessor of $100 from each producing gas well. After the completion of the well, this sum was tendered and refused. An action to cancel was brought. The court based its judgment refusing cancellation upon the fact that the lessor was tendered all she was entitled to from the production. The court said, "So long as she received payment of the $100 per annum and had the use of gas for domestic purposes she was entitled to claim no other revenue or consideration from lessee on account of the well in question." The court makes these significant statements: "It was a condition precedent to the right of defendant to continue operations beyond a period of five years that oil and gas or either of them should be found upon the premises in paying quantities, or gas in quantities large enough to transport should be found thereon within the five years." And "if January 9th be taken as the correct date of the lease, gas in paying quantities and in sufficient quantities to transport was found before the expiration of five years." The factual situation in that case was so different that it is clearly distinguishable from the problem before us.

In Strange v. Hicks, 1920, 78 Okl. 1, 188 P. 347, 349, the court concluded that the "unless" or "as long thereafter" clause was ambiguous and that the sense in which the parties used it in the contract was not clear; and it was, therefore, up to the court to judiciously construe the sense in which they used the phrase. So treating the phrase, the court concluded that the parties did not intend that the lease should terminate at the end of the primary term if the well had been drilled but a market had not been found. It is also significant that in that case were facts which would work an estoppel against the lessors in their attempt to quiet their title against the lessee.

In Bain v. Portable Drilling Corp., 1948, 200 Okl. 569, 198 P.2d 207, 209, was involved a one year oil and gas lease dated October 22, 1945. In addition, the lessee also bound itself in a separate contract to commence the drilling of a well within 120 days and prosecute it to the Hunton Lime. Defendant commenced this well within time and drilled it approximately 4,490 feet to the Hunton Lime, where no production was found. In drilling the well gas had been encountered at a lesser depth, and after failure to produce from the Hunton Lime on September 9, 1946, the well was shot and then produced some gas. The lessee spent several days washing the sands or using other methods in an effort to increase the production of gas but did not at that time obtain production in commercial quantities. No further effort was made to produce gas until February, 1947, at which time gas was successfully produced. The contention was that the lessee failed to produce within the primary term. This case did not turn upon whether the lessee would have a reasonable time after the expiration of the primary term to complete a well begun during the primary term and market the products therefrom, because the lease contained the provision providing that " 'if the lessee shall commence to drill a well within the term of this lease or any extension thereof, the lessee shall have the right to drill such well to completion with reasonable diligence and dispatch, and if oil or gas, or either of them be found in paying quantities, this lease shall continue and be in force with like effect as if such well had been completed within the term of years herein first mentioned.' " Obviously, under this provision the court held that the lessee had a right to complete the well.

In Parks v. Siani Oil & Gas Co., 1921, 83 Okl. 295, 201 P. 517, a lease was involved which expired by its terms June 17, 1947. The well was commenced on

June 4 or 5 and completed as an oil well on June 19. The question in the case was whether gas was being produced during the primary term. The trial court made general findings of fact denying cancellation of the oil and gas lease. The Supreme Court in affirming the decision held that there was conflicting evidence as to whether gas was being produced during the primary term and that under that status the general findings of the court that gas was being produced would not be disturbed.

While not exactly overruled, the later decisions of the Oklahoma Supreme Court make it clear that the holding in the Strange case, that the "unless" or "so long thereafter" clause of an oil and gas lease is ambiguous and susceptible of judicial construction as to the sense in which the contracting parties used it, is no longer the law of Oklahoma. In Anthis v. Sullivan Oil & Gas Co., 1922, 83 Okl. 86, 203 P. 187, 189, the Oklahoma Court speaking of this clause said, "The language used is plain and unambiguous. The parties, in language which cannot be misconstrued, provide that the lease should remain in full force for one year, and as long thereafter as oil or gas, or either of them, is produced therefrom. A contract is ambiguous when it is susceptible of more than one meaning.

"If this phrase 'as long thereafter as oil or gas, or either of them, is produced therefrom,' is ambiguous, it must be susceptible of more than one meaning. If it is susceptible of any construction except exactly what it says, we are not informed as to what it is. We know of no construction that can be placed upon the phrase, except when the parties failed to produce oil and gas from said lands after one year the lease terminated. There might be some question arise whether the lessee was producing oil or gas within the meaning or terms of the lease, but there can be no controversy on this question when there is no well on the prem-

ises from which oil or gas can be produced."[2]

In Woodruff v. Brady, 1930, 181 Okl. 105, 72 P.2d 709, 113 A.L.R. 391, the Oklahoma Court held that "Where an oil and gas mining lease is executed for a given term and as long thereafter as oil or gas is produced from the leased premises, if the lessee at any time subsequent to the expiration of the primary, or given, term, fail to produce oil or gas in paying quantities, except where production may be lessened by reason of a bona fide attempt to increase the same in existing wells, the lease will expire by its own terms."

And in the late case of Owens v. Day, 1952, 207 Okl. 341, 249 P.2d 710, 711, the Supreme Court reviewed a number of its cases and stated, "In these cases we held that where an oil and gas lease was for a specific term and as long thereafter as oil or gas was produced the lease expired upon the termination of production unless the failure to produce, as stated in Woodruff v. Brady, supra, was due to a bona fide attempt to increase production in the existing well." And in speaking of the clause in the lease under consideration in that case the Oklahoma Court said, "This language is clear, plain and unmistakable and upon the cessation of production and the withdrawal of the lessees from the land the interest of defendants terminated. *The court may not read into the conveyance stipulations which were not placed therein by the grantors, since it is evident that the intention of the grantors was that when, after the expiration of the primary term of the grant, the land ceased to produce, the right of the grantees terminated.*"[3]

Neither is there uncertainty as to the meaning of the term "produced" under the decisions of the Oklahoma Court. In the Ponder case, supra, the court said the term "produced" means produced and marketed so that the lessor may receive his royalty therefrom.

2. To the same effect see Gypsy Oil Co. v. Marsh, 1926, 121 Okl. 135, 248 P. 329, 48 A.L.R. 876; Gypsy Oil Co. v. Ponder, 1923, 92 Okl. 181, 218 P. 663; Western States Oil & Land Co. v. Helms, 1930, 143 Okl. 206, 288 P. 964, 72 A.L.R. 357; Woodruff v. Brady, 1937, 181 Okl. 105, 72 P.2d 709, 113 A.L.R. 391; Owens v. Day, 1952, 207 Okl. 341, 249 P.2d 710.

3. Emphasis supplied.

Summarizing the Oklahoma decisions, they seem to me to hold that oil or gas must be produced—that is brought to the surface and sold—during the primary term or the lease will be at an end under the "unless" or "so long thereafter" clause of their contract. The only cases as I review them in which the court has departed from that holding are cases where a well is being produced during the primary term but production is temporarily interrupted for the purpose of additional exploration. The cases make it clear that such explorations must be diligently prosecuted and without delay.

Whether the Oklahoma Court will ultimately hold that where a lessee is unable because of lack of pipeline connections to produce a well drilled during the primary term, the lease will be extended to enable the lessee to obtain a market is a matter of conjecture. From its pronouncements, as I interpret them, I am convinced that if it does so hold only a reasonable time will be given to produce the well and that a time extending on and on from year to year because of the failure to find a market, even though diligence is exercised in seeking such a market, is unreasonable and is not within the purview of the clear language of the "unless" or "so long thereafter" clause.

As stated by the Oklahoma Court, in construing the word "produced" we must keep in mind the interest of the lessor as well as the lessee. The purpose of the lease is to give the lessor the benefit of the production so that he may have his interest in the production presently and not in the distant future, perhaps after he is gone and only his heirs can receive the benefit of a contract made for his own benefit. If "produced" means bringing to the surface and marketing the mineral products so that the lessor's interest is presently available to him, gas or oil is not being produced when a well is shut in and kept capped for years because the lessee can find no market. That is not what the parties contemplated when they signed the lease and inserted the "unless" or "so long thereafter" clause therein.

If such a construction works hardship upon the lessee it comes about by reason of the contract it made and the courts must nonetheless give effect thereto "even though the contract contains harsh terms that imposes burdensome duties on one or more parties." [4]

How long is too long? My Associates say that 9½ years after the completion of the well is not too long a time. Is 15 years, 20 years, or 25 years too long a time? Who shall say? May we under the exercise of an equitable jurisdiction determine that question ourselves? It seems to me what we in effect say is that because this was wildcat territory a considerable distance from a pipeline the parties must have contemplated that a considerable time, at least as long as 9½ years, might be required to produce the well. This I do not think is within our province to say. Such is not the contract they made and under the Oklahoma decisions we may not rewrite their contract, even though we may feel that construing it as they wrote it leads to harsh results.

This being wildcat territory, and it being known that the only available pipeline was miles away and that producing the gas from this well also depended upon a considerable amount of additional production from other wells, the lessees must have realized that a considerable time element would be involved in producing the well. It should have taken these factors into account when the lease contract was made. There was in use at the time a form of lease containing a shut-in royalty payment provision for such time as the lessees were unable to produce the well, although exercising due diligence, but the lessee did not see fit to incorporate such a provision in their contract. Had it done so, this case would not be here. Where a situation is foreseeable and no provision is made in the lease therefor, inability to produce after

4. Gypsy Oil Co. v. Ponder, 1923, 92 Okl. 181, 218 P. 663.

the expiration of the primary term will not extend the contract.[5]

Neither are these views inconsistent with anything we said in Christianson v. Champlin Refining Co., 10 Cir., 1948, 169 F.2d 207. In that case we held that 15 months required to bring a well to production after the expiration of the primary term was not unreasonable. Whether that case is good law is beside the point. We stressed that two factors must be present, (1) due diligence, and (2) production within a reasonable time. We held that under the peculiar facts of that case 15 months was not an unreasonable time. It is no authority for holding that 9½ years under all the facts of this case is a reasonable time.

For these reasons I am unable to concur with my Associates and, therefore, respectfully dissent.

---

5. Berline v. Waldschmidt, 1945, 159 Kan. 585, 156 P.2d 865; Stanolind Oil & Gas Co. v. Barnhill, Tex.Civ.App.1937, 107 S.W.2d 746; Smith v. Sun Oil Co., 1931, 172 La. 655, 135 So. 15.