Charles H. SWORD et al.,
Plaintiffs-Appellants,

v.

Wilson RAINS et al.,
Defendants-Appellees.

No. 76–1872.

United States Court of Appeals,
Tenth Circuit.

Argued Jan. 23, 1978.
Decided May 8, 1978.

Clifford L. Malone, Wichita, Kan. (Donald W. Bostwick, Wichita, Kan., on the brief), for plaintiffs-appellants.

William Tinker, Wichita, Kan. (Arthur W. Skaer, Jr., Wichita, Kan., on the brief), for defendant-appellee, Arthur W. Skaer.

Thomas P. Garretson, Wichita, Kan. (Robert G. Martin, Wichita, Kan., on the brief), for defendants-appellees, Wilson Rains et al.

Before McWILLIAMS, BREITENSTEIN and McKAY, Circuit Judges.

McWILLIAMS, Circuit Judge.

This case concerns an oil and gas lease. Charles H. Sword, the owner of 160 acres of land in Meade County, Kansas, entered into an oil and gas lease for a primary term of one year commencing July 23, 1971. Sword subsequently executed an extension of the lease whereby the primary term of the lease was extended an additional three months, from July 23, 1972, to October 23, 1972. The landowners adjacent to Sword also executed oil and gas leases. All the leases, including Sword's eventually were assigned to and became vested in Wilson Rains and Arthur W. Skaer, and others, who will hereinafter be referred to as Rains.

On September 23, 1972, Rains commenced a test well on Sword's land. On October 7, 1972, a drill stem test indicated the presence of gas. Total depth was reached on October 15, 1972, on which date casing was set. By November 8, 1972, the well was completed, was flowing gas, and was ready for pipeline connection except for final open flow testing.

Rains next began efforts to market the gas. These efforts will be considered later and need not at this point be detailed. It is sufficient here to simply note that Rains made contact with Panhandle Eastern Pipe Line Company, and others, as possible purchasers of the gas. Negotiations with Panhandle ensued, resulting in the signing of a contract for the sale of the gas on June 6, 1973. Thereafter Rains commenced operations to lay a pipeline to Panhandle's gathering system, some .7 miles distant. On

August 20, 1973, gas deliveries to Panhandle commenced. In the fall of 1974 a twenty-year gas purchase contract with Panhandle was finalized.

On October 23, 1973, Sword, a citizen of California, commenced the present action in the United States District Court for the District of Kansas. Jurisdiction was based on diversity. The action sought to have the oil and gas lease executed by Sword declared terminated and to quiet title to the land in Sword. It was Sword's theory of the case that the oil and gas lease had expired under its own terms because of the failure of Rains to comply with certain lease deadlines. Rains had entered into a unitization agreement with landowners adjacent to the Sword land, and Sword also sought in the present proceeding to have the unitization agreement set aside.

Trial of the case was to the court. The trial court entered detailed findings of fact and conclusions of law which held, in essence, that the unitization agreement was valid, and that, under the "continuous operation" clause in the oil and gas lease, the lease had not expired and that there had been no breach thereof by Rains. Accordingly, the trial court entered judgment dismissing Sword's claims "on the merits."

On appeal, Sword does not challenge that part of the trial court's judgment upholding the unitization agreement. He does, however, seek reversal of the judgment insofar as it dismissed his quiet title claim.

As previously mentioned, the oil and gas lease under consideration was for a primary period of one year, commencing July 23, 1971. On June 21, 1972, the lease was extended for a period of three months to October 23, 1972. Specifically, the extension agreement provided that ". . . said term of said lease shall be and is hereby extended, with the same tenor and effect as if such extended term had been expressed in such lease, for a period of three months from the date of the said expiration thereof and as long thereafter as oil or gas (including casing lead gas) is produced from any well on the land covered by said lease; . . . ."

As indicated, Rains commenced drilling on the leased premises on September 23, 1972. This occurred within the primary term of the lease, as extended. By October 23, 1972, the expiration date of the primary term of the lease, as extended, Rains had completed his test drilling and had discovered gas in paying quantities. The well itself was substantially completed by November 8, 1972, and then shut down, because of adverse weather.

The habendum clause of the Sword lease provides for a primary term of one year from its date, which was later extended for an additional three months, "and as long thereafter as oil or gas, . . . and other minerals may be produced from said leased premises or operations for the drilling or production thereof are continued as hereinafter provided."

Section 7 of the lease, the so-called "continuous drilling" provision, reads as follows:

7. It is expressly agreed that if the lessee shall commence operations for the drilling of a well at any time while its lease is in force this lease shall remain in force and its terms shall continue for so long as such operations are prosecuted and, if production results therefrom, then so long as such production may continue.

Under the terms of the lease, then, if Rains commenced drilling a well within the primary term of the lease, as extended, which he did on September 22, 1972, the lease shall remain in force and continue "for so long as such operations are prosecuted," and if there be production, "so long as such production may continue."

Under Kansas law, in the absence of a continuous operations clause, there must be actual production within the primary period of the lease, and without such production, the lease will expire by its own terms. *Home Royalty Association v. Stone*, 199 F.2d 650 (10th Cir. 1952). However, a "continuous operation" clause extends the lease for so long as the lessee-operator exercises due diligence in equipping the well and getting it into production, which includes the marketing of the gas. *Christian-*

son v. *Champlin Refining Co.*, 169 F.2d 207 (10th Cir. 1948). To the same effect, see *Tate v. Stanolind Oil & Gas Company*, 172 Kan. 351, 240 P.2d 465 (1952). In *Tate*, the Kansas Supreme Court spoke as follows:

From this provision [a continuous operations clause], standing alone, it clearly appears that even though a well is only commenced during the primary term, it may be completed thereafter with reasonable diligence and dispatch. Obviously if on completion of drilling operations oil or gas is found in paying quantities the lessee, under this clause, is not expressly required to produce or market the oil or gas immediately. And, of course, that might be wholly impossible. He would, however, be required to do so within a reasonable time. But even if the drilling clause reasonably could be interpreted as requiring both production and marketing immediately upon completion of the well it is nevertheless clear the necessity therefor was extended beyond the fixed primary term.

    \*     \*     \*     \*     \*     \*

It is impossible to lay down an accurate general rule with respect to what constitutes production or marketing within reasonable time in every case. Whether either has been so obtained must be left to the particular facts of cases as they arise.

■ Application of the continuous operations doctrine to the instant case means that the Sword oil and gas lease continued after October 23, 1972, for so long as Rains continued with due diligence his production efforts, which included his efforts to market the gas. In this regard the trial court found and concluded that Rains had acted within a reasonable time and with due diligence in his effort to sell the gas to a gas company. It was on this basis that the trial court concluded that the Sword lease had not expired by its own terms and accordingly refused to quiet title in Sword.

Whether Rains acted in reasonable time and with due diligence in marketing the gas is essentially a question of fact. In our view, there is substantial evidence to support the trial court's holding that Rains acted with due diligence. Certainly such finding is not clearly erroneous. It is on this basis that we affirm.

The primary term of the lease, as extended, was October 23, 1972. Rains commenced drilling a well on the leased acreage in September, 1972, and had discovered gas in paying quantities prior to October 23, 1972. The well was for all practicable purposes completed in November, 1972, and then shut down because of adverse weather. Rains then began looking for someone who might be interested in purchasing the newly discovered gas. It would have been to the monetary advantage of both Sword and Rains if the gas could have been sold in intrastate commerce. Apparently, there were no intrastate gas purchasers within reasonable proximity of the Rains well, and accordingly Rains began looking for an interstate purchaser. Contact was made with three potential purchasers, Panhandle Eastern Pipe Line Company, Michigan-Wisconsin Pipe Line Company, and Northern Natural Gas Company.

As indicated, gas sold in intrastate commerce went for a higher price than that for gas sold in interstate commerce. However, in 1970, the Federal Power Commission, acting in response to the shortage of natural gas that was being dedicated to interstate pipelines, issued new policy statements and regulations designed to attract new dedications of gas to the interstate market. By Order No. 428–B, issued July 15, 1971, the Federal Power Commission established an exemption from certain filing and rate requirements for small producers of natural gas. This Order enabled small producers to initiate sales in interstate commerce at a price in excess of the existing area rate. Rains throughout had been proceeding on the premise that as a small producer he could eventually sell his gas through open market negotiations with competing gas purchasers, free from the existing area rate. However, on December 12, 1972, the Court of Appeals for the District of Columbia ruled that the Federal Power Commission had exceeded its authority under the Natural Gas Act in exempting

small producers from area rate regulation. *Texaco, Inc. v. Federal Power Commission,* 154 U.S.App.D.C. 168, 474 F.2d 416 (1972). It was not until June 10, 1974, that the Supreme Court vacated the order of the Circuit Court and remanded the case with direction that there be further proceedings before the commission. *Federal Power Commission v. Texaco, Inc.,* 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974).

It is Rains' position that he acted reasonably and with due diligence in marketing the gas. In determining whether Rains proceeded with due diligence, considerable emphasis is laid on the rather chaotic and uncertain market conditions resulting from the *Texaco* decision by the District of Columbia Circuit Court which struck down the small producers' exemption. The trial court recognized the effect of the *Texaco* decision, and, in light of all the facts and circumstances, found that Rains had acted with due diligence in executing a gas purchase agreement in June, 1973, and by commencing delivery in August 1973.

As indicated in both *Christianson v. Champlin Refining Co.,* 169 F.2d 207 (10th Cir. 1948) and *Tate v. Stanolind Oil & Gas Co.,* 172 Kan. 351, 240 P.2d 465 (1952), what constitutes marketing within a reasonable time and with due diligence depends on the particular facts of the case at hand. In *Christianson,* where there was about fifteen months between completion and a marketing contract, the lessee was held to have acted within a reasonable time under the circumstances. In *Tate* about four months elapsed between completion and a marketing contract, and the lessee was there held to have acted within a reasonable time. The instant case falls in between *Christianson* and *Tate,* there being some eight months between completion and a marketing agreement.

■ The passage of time is not in itself determinative of the question of reasonable time, and due diligence, though it of course is a factor to be considered. *Bristol v.*

*Colorado Oil & Gas Corporation,* 225 F.2d 894 (10th Cir. 1955).* In *Bristol* we observed that although reasonable time and due diligence do not have the same meaning in the application of the rule of reason, both are nonetheless essential ingredients of the rule. Other factors also entered into the picture. For example, the lessee does not have to accept the first offer. It is to his benefit, as well as to the benefit of the lessor, that he obtain as high a price as possible for the gas. All that the law requires is that the lessee act with due diligence in marketing the gas. The trial court here held that Rains had so acted, and in our view, there is ample evidence to support this determination.

■ Sword notes that at one time Rains was considering selling his interest. Counsel argues that such negates any *continuing* effort by Rains to market. This argument is too semantical, and cannot, by itself, dispose of the entire controversy. Rains counters this argument by asserting that notwithstanding the possibility of a sale, he nonetheless was at all times continuing his efforts to market the gas. In any event, the trial court took this fact into consideration and from the totality of the evidence, and not from one isolated fact, found due diligence on the part of Rains. We are not inclined to disturb this holding.

The other matter urged here by Sword as ground for holding that the oil and gas lease terminated under its own terms is in our view unavailing. We have reference to Sword's assertion that by virtue of certain language appearing in paragraph seven of the oil and gas lease, the lease expired under its own terms on July 23, 1973, because of Rains' failure to actually market gas by that date. We do not believe the language relied on has present pertinency, and, in any event, because of the three-month extension, the cut-off date would be October 23, 1973, not July 23, 1973.

Judgment affirmed.

---

* In *Bristol* a lapse of 7⅔ years was held not to preclude a finding of due diligence in marketing.