No. 01-758

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 329

SANDTANA, INC., a Montana Corporation,

       Plaintiff and Appellant,

   v.

WALLIN RANCH COMPANY, a Montana Corporation;
BRENT H. SCHELLIN; NELLIE JO NICHOLSON; and
KLABZUBA OIL AND GAS, a Family Limited Partnership,

       Defendants and Respondents.

APPEAL FROM:    District Court of the Seventeenth Judicial District,
                  In and for the County of Blaine, Cause No. DV-00-12
                  The Honorable John C. McKeon, Judge presiding.

COUNSEL OF RECORD:

       For Appellant:

              Jack L. Lewis and George N. McCabe, Jardine, Stephenson, Blewett &
              Weaver, Great Falls, Montana

       For Respondents:

              Bruce A. Fredrickson, Crowley, Haughey, Hanson, Toole & Dietrich, PLLP,
              Kalispell, Montana; John R. Lee and Colby L. Branch, Crowley, Haughey,
              Hanson, Toole & Dietrich, PLLP, Billings, Montana

                               Submitted on Briefs:  March 14, 2002

                                         Decided:  December 2, 2003

Filed:

_____
                          Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Sandtana, Inc. (Sandtana) brought this declaratory judgment action against the Wallin Ranch Company, Brent H. Schellin, Nellie Jo Nicholson (collectively, the Wallin group) and Klabzuba Oil and Gas (KOG) in the District Court for the Seventeenth Judicial District, Blaine County, seeking to confirm the validity of three oil and gas leases granted by the Wallin group to Wells Petroleum, Inc. (Wells). The District Court granted summary judgment in favor of the Wallin group and KOG and denied Sandtana's motion. Sandtana appeals. We affirm.

¶2 We address the following issues as reframed by the Wallin group and KOG:

¶3 1. Whether the District Court erred in determining that the Pugh clauses added to the subject oil and gas leases required that rentals be paid on or before the expiration of the primary term in order to extend the leases as to undeveloped sections.

¶4 2. Whether the District Court erred in determining that Sandtana's late tender of rentals caused the subject oil and gas leases to terminate as to all undeveloped sections.

## FACTUAL AND PROCEDURAL BACKGROUND

¶5 Brent H. Schellin, Nellie Jo Nicholson, Robert J. Schellin, Karen Schellin and Susette Schellin are brothers and sisters. Robert is President of the Wallin Ranch Company. All of the lands described below are owned by the Wallin Ranch Company.

> Township 35 North, Range 17 East, M.P.M.
> Section 13: W½, SE¼
>
> Township 35 North, Range 18 East, M.P.M.
> Section 18: Lots 1, 4, SE¼SW¼, W½SE¼
> Section 19: Lots 1-4, E½W½, E½

2

Section 20: S½NW¼, N½SW¼, SW¼SW¼, S½NE¼
Section 21: SW¼NW¼, NW¼SW¼
Section 28: W½NW¼, N½SW¼
Section 29: N½NW¼, SW¼NW¼, S½, NE¼
Section 30: Lots 1, 2, E½NW¼
Section 31: E½
Section 32: S½

¶6 At all times relevant to this action, the Wallin Ranch Company, Brent, Nellie Jo, Karen, and Susette owned mineral interests in the lands as tenants in common. On September 8, 1994, Brent, Nellie Jo and the Wallin Ranch Company leased to Wells in three separate "Producer 88" leases, their oil and gas interest rights in these tracts of land located in Blaine County, Montana. Each lease was for a primary term of five years. The first two paragraphs of each lease contained the following habendum, drilling operations, continuous drilling operations, and "paid up" lease provisions:

1. It is agreed that this lease shall remain in force for a term of (5) years from this date and as long thereafter as oil or gas of whatsoever nature or kind is produced from said leased premises or on acreage pooled therewith, or drilling operations are continued as hereinafter provided. [This first sentence is herein referred to as the "habendum clause."] If, at the expiration of the primary term of this lease, oil or gas is not being produced on the leased premises or on acreage pooled therewith but Lessee is then engaged in drilling or re-working operations thereon, then this lease shall continue in force so long as operations are being continuously prosecuted on the leased premises or on acreage pooled therewith; [This first portion of the second sentence is herein referred to as the "drilling operations clause."] and operations shall be considered to be continuously prosecuted if not more than ninety (90) days shall elapse between the completion or abandonment of one well and the beginning of operations for the drilling of a subsequent well. [This latter portion of the second sentence is herein referred to as the "continuous drilling operations clause."] If after discovery of oil or gas on said land or an acreage pooled therewith, the production thereof should cease from any cause after the primary term, this lease shall not terminate if Lessee commences additional drilling or re-working operations within ninety (90) days from date of cessation of production or from date of completion of dry hole. If oil or gas

3

shall be discovered and produced as a result of such operations at or after the expiration of the primary term of this lease, this lease shall continue in force so long as oil or gas is produced from the leased premises or on acreage pooled therewith.

2.  This is a PAID-UP LEASE.  In consideration of the down cash payment, Lessor agrees that Lessee shall not be obligated, except as otherwise provided herein, to commence or continue any operations during the primary term.  Lessee may at any time or times during or after the primary term surrender this lease as to all or any portion of said land and as to any strata or stratum by delivering to Lessor or by filing for record a release or releases, and be relieved of all obligation thereafter accruing as to the acreage surrendered.

¶7     Wells offered similar leases to Karen and Susette.  In reviewing the lease for her portion of the mineral interests, Karen realized that the habendum clause potentially allowed the Lessee to put off drilling until the very last day of the primary term and thereby hold all of the leased lands indefinitely.  Consequently, Karen refused to sign her lease.  She eventually agreed to execute the lease if Wells would add an addendum to all of the family's leases including the already executed Wallin group leases.  This addendum, generally referred to as a "Pugh clause,"[1]  contained the following language:

> Notwithstanding any language contained herein to the contrary, production from any well drilled hereunder shall not serve to extend the primary term of this lease, except as to the leased premise contained within the governmental Section in which a producing well is located.  Lessee shall be entitled to extend this lease beyond the primary term as to leased premises located outside a governmental Section containing a producing well by paying or tendering to lessor on or before the expiration of the primary term an annual rental of one dollar per net acre which shall cover the privilege of deferring the expiration of said leased premise for 12 months from the expiration date of the

---

[1]  A "Pugh clause" modifies an oil and gas lease by segregating the leased lands into developed lands that may be held pursuant to the habendum clause and undeveloped lands that may only be held as provided in the Pugh clause itself.  *See Federal Land Bank v. Texaco, Inc.* (1991), 250 Mont. 471, 474, 820 P.2d 1269, 1271.

primary term. Lessee has the option of extending for additional twelve month periods the expiration of any lease premises lying outside any governmental Section containing a producing well by paying or tendering to lessor, on or before the anniversary date of the expiration of the primary term, a rental amount escalating at the rate of $1.00 per net acre per year for each subsequent annual rental. However, lessee may not extend the primary term of any leased premises lying outside a governmental Section containing a producing well for more than five years beyond the primary term.

¶8 The Pugh clauses were duly executed and were submitted to the Blaine County Clerk and Recorder for recording on August 10, 1995. The leases granted by Karen and Susette were for a primary term of five years beginning June 1, 1995. Since the primary term of Karen's and Susette's leases expired almost nine months later than the Wallin group leases, the continued validity of Karen's and Susette's leases is not at issue in this action.

¶9 Sandtana is the successor in interest to Wells as to the Wallin group leases. Sandtana acquired the drilling rights to the leased lands on October 28, 1998. On September 7, 1999, the day before the leases were to expire, Sandtana commenced drilling a well on the Wallin Ranch in Section 19. By letter dated September 10, 1999, Sandtana, acting through J. Burns Brown Operating Co. (JBBO), mailed to each member of the Wallin group a check identified as being payment for shut-in royalties for the well in Section 19 and the delay rental of $1.00 per net acre for the leased acreage outside of Section 19.

¶10 On September 23, 1999, Robert returned these checks to JBBO on behalf of the Wallin group stating that based on the Pugh clause in each lease, Sandtana's option to extend the leases on acreage outside of Section 19 was conditioned upon the rental being paid on or before the expiration of the primary term. Since payment was not made until September 10, 1999, two days after the primary term expired, it was the Wallin group's position that

5

the leases were not extended beyond the primary term for lands outside of Section 19.

¶11    On October 22, 1999, the Wallin group leased to KOG the same lands (except Section 19) that had been previously leased to Sandtana. These leases were recorded in the office of the Blaine County Clerk and Recorder on October 25, 1999.

¶12    Sandtana, meanwhile, spudded a well on the Wallin Ranch in Section 31 on October 22, 1999. This well was completed as a dry hole on October 24, 1999.

¶13    On January 7, 2000, KOG notified JBBO by letter that KOG intended to vigorously defend its leases. The following day, Robert, on behalf of the Wallin group, notified JBBO by letter that Sandtana's leases had expired and that Sandtana no longer had the right to drill on any land on the Wallin Ranch outside Section 19. Notwithstanding, Sandtana spudded a well on the Wallin Ranch in Section 20 on January 20, 2000. This well was completed as a dry hole on January 22, 2000.

¶14    Thereafter, Sandtana decided that it was precluded from further drilling by the cloud upon its leasehold title. Consequently, Sandtana commenced this action on April 12, 2000. In its complaint, Sandtana contended that there was not a "producing" well on the leased lands, therefore, the Pugh clause did not become effective and without the Pugh clause, Sandtana was not required to pay delay rentals prior to the expiration of the primary term in order to extend the leases on all of the leased lands.

¶15 The parties filed cross-motions for summary judgment in May 2001. After a hearing on the motions, the District Court concluded that because the rental payments under the Pugh clauses were not timely tendered, the oil and gas leases on all of the lands outside of Section 19 terminated on September 8, 1999. Hence, in its August 22, 2001 order, the court granted the Wallin group and KOG's motion for summary judgment and denied Sandtana's motion for summary judgment.

¶16 Sandtana now appeals from the District Court's Final Judgment and Decree entered on September 10, 2001.

## STANDARD OF REVIEW

¶17 Our standard of review in appeals from summary judgment rulings is *de novo*. *Oliver v. Stimson Lumber Co.*, 1999 MT 328, ¶ 21, 297 Mont. 336, ¶ 21, 993 P.2d 11, ¶ 21 (citing *Motarie v. N. Mont. Joint Refuse Disposal* (1995), 274 Mont. 239, 242, 907 P.2d 154, 156; *Mead v. M.S.B., Inc.* (1994), 264 Mont. 465, 470, 872 P.2d 782, 785). When we review a district court's grant of summary judgment, we apply the same evaluation as the district court based on Rule 56, M.R.Civ.P. *Oliver*, ¶ 21 (citing *Bruner v. Yellowstone County* (1995), 272 Mont. 261, 264, 900 P.2d 901, 903). We set forth our inquiry in *Bruner* as follows:

> The movant must demonstrate that no genuine issues of material fact exist. Once this has been accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue does exist. Having determined that genuine issues of fact do not exist, the court must then determine whether the moving party is entitled to judgment as
> a matter of law. We review the legal determinations made by a district court as to whether the court erred.

7

*Oliver*, ¶ 21 (quoting *Bruner*, 272 Mont. at 264-65, 900 P.2d at 903 (internal citations omitted)).

**Issue 1.**

¶18    *Whether the District Court erred in determining that the Pugh clauses added to the subject oil and gas leases required that rentals be paid on or before the expiration of the primary term in order to extend the leases as to undeveloped sections.*

¶19    In granting summary judgment to the Wallin group and KOG, the District Court determined that the leases in question were not ambiguous and that they had terminated by operation of the plain language of the added Pugh clauses.

¶20    Sandtana argues on appeal that the District Court, by its ruling, either deleted the drilling operations and continuous drilling operations clauses in ¶ 1 of the leases or changed the language of the Pugh clauses to reach its holding. Sandtana maintains that the court erred thereby because courts may resort to the usual rules of construction to ascertain what the parties intended by the language they employed only when an ambiguity exists and as the District Court itself held, no ambiguity existed here.

¶21    Sandtana contends that for the Pugh clauses to become operative in this case, there had to be production from a well drilled on the leased premises prior to the expiration of the primary term of the leases. Sandtana maintains that there was no producing well on any of the leased lands at the expiration of the primary term, therefore, the Pugh clauses did not become operative and the drilling operations and continuous drilling operations clauses control.

¶22    In addition, Sandtana contends that the Pugh clauses do not require that the drilling

8

operations or continuous drilling operations clauses be deleted or excised from ¶ 1 of the leases. Therefore, because the Pugh clauses do not negate the language of the drilling operations and continuous drilling operations clauses and are instead silent as to these clauses, the drilling operations and continuous drilling operations clauses must be given effect. Consequently, Sandtana claims that the leases could be extended by *either* (1) pursuing drilling operations at the expiration of the primary term, *or* (2) paying delay rentals prior to the expiration of the primary term. Sandtana further contends that based on the foregoing, the subject leases are still in effect for all of the lands described in the leases because Sandtana was conducting drilling operations on the leased lands at the end of the primary term and thereafter timely conducted continuous drilling operations thereon.

¶23 The Wallin group argues, on the other hand, that generally, under the terms of a standard oil and gas lease, either production or drilling operations on any part of the leased lands will perpetuate the lease as to all of the leased lands. The Wallin group maintains that the Pugh clauses at issue here changed that general rule in this case and that the second sentence of the Pugh clauses control extension of the leases beyond the primary term as to non-producing sections.

¶24 The Wallin group further argues that there is nothing in the Pugh clauses that require that their provisions apply only if production is obtained prior to expiration of the primary term. Rather, they interpret the Pugh clauses to mean that rentals are required to retain each section unless production is established in that section.

¶25 After a careful reading of the leases at issue in this case, we conclude that both parties

9

make the same interpretational mistake. Sandtana reads the habendum clause to the exclusion of the Pugh clause while the Wallin group reads the Pugh clause to the exclusion of the habendum clause. Because both clauses are part of the same lease, we must read them together and try to reconcile the two.

¶26 In construing an oil and gas lease, courts will generally apply the rules of contract interpretation. In doing so, we have previously stated:

> [T]he intention of the parties is to be pursued if possible. This intention is to be gathered from the entire agreement, not from particular words or phrases or disjointed or particular parts of it . . . . The contract must be viewed from beginning to end, and all its terms must pass in review; for one clause may modify, limit or illuminate the other.

*Federal Land Bank*, 250 Mont. at 474, 820 P.2d at 1271 (quoting *Lee v. Lee Gold Mining Co.* (1924), 71 Mont. 592, 599, 230 P. 1091, 1093). Furthermore,

> [I]t is well established that a court, in interpreting a written instrument, will not isolate certain phrases of that instrument in order to garner the intent of the parties, but will grasp the instrument by its four corners and in light of the entire instrument, ascertain the paramount and guiding intention of the parties.

*Federal Land Bank*, 250 Mont. at 474-75, 820 P.2d at 1271 (quoting *Steen v. Rustad* (1957), 132 Mont. 96, 102, 313 P.2d 1014, 1018).

¶27 The habendum clause in an oil and gas lease allows production or operations anywhere on the leased lands or lands pooled therewith to perpetuate the lease beyond the primary term as to all of the leased lands. Thus, an operator could drill on a far corner of the leasehold on the last day of the primary term, complete the well as a shut-in gas well, and thereby extend the lease beyond the primary term as to all of the leased lands for little or no real consideration. However, this behavior robs the lessors of their one true consideration

10

in executing the lease in the first place--diligent development of the leased lands. *See Solberg v. Sunburst Oil & Gas Co.* (1926), 76 Mont. 254, 262, 246 P.2d 168, 172.

¶28    Pugh clauses were designed to prevent this possibility. While there are many variations of Pugh clauses, the main purpose of any Pugh clause "is to protect the lessor from the anomaly of having the entire property held under a lease by production from a very small portion." *Sandefer Oil & Gas v. Duhon* (5th Cir. 1992), 961 F.2d 1207, 1209 (citing *Rogers v. Westhoma Oil Co.* (10th Cir. 1961), 291 F.2d 726, 731). Pugh clauses are thus designed to benefit the lessor by encouraging diligent development of the leased premises and discouraging the idle retention of undeveloped lands. *Sandefer*, 961 F.2d at 1209.

¶29    In the case before us on appeal, the first two sentences of the Pugh clause in each lease provide:

> Notwithstanding any language contained herein to the contrary, *production from any well drilled hereunder shall not serve to extend the primary term of this lease*, except as to the leased premise contained within the governmental Section in which a producing well is located. Lessee shall be entitled to extend this lease beyond the primary term as to leased premises located outside a governmental Section containing a producing well *by paying or tendering to lessor on or before the expiration of the primary term an annual rental* of one dollar per net acre which shall cover the privilege of deferring the expiration of said leased premise for 12 months from the expiration date of the primary term. [Emphasis added.]

Thus, the real question at issue here is whether the well in Section 19 was a "producing well" or "production" for purposes of the Pugh clauses.

11

¶30    The meaning of the term "production" varies with the state in which the leased lands lie.[2] The term "production" has come to be a word of art in some jurisdictions in that it carries a meaning broader than its literal meaning.  The problem arises with respect to whether the term "production" is construed to require actual removal of the oil or gas from the earth and whether it is also construed to require marketing the oil or gas.

¶31    The problem of actually extracting oil or gas from leased lands prior to the end of the primary term is much greater where gas rather than oil is found as in the case *sub judice*. After discovery, oil may immediately be extracted and stored above ground and a readily available market usually exists.  Transportation to market may be done by truck if pipeline facilities are not available.  This is not true in the case of gas.  Gas may not be effectively stored above ground, it must be transported by pipeline.  If the gas well is a discovery well, it is usual that pipeline facilities will not be found nearby. Generally, if no pipeline facilities are available, a gathering line will not be constructed until a sufficient number of wells have been developed in the field to economically justify the building of such a  line.  Therefore, a considerable time gap may exist between the discovery of the gas and extraction.

¶32    Except in a few states, *actual extraction* of the oil or gas is required to extend an oil and gas lease into the secondary term under the provisions of a habendum clause.  Without extraction, the lease will automatically terminate at the end of the primary term unless it is

---

[2] For a more complete discussion of the term "production" and its meaning in oil and gas leases, see Eugene Kuntz, *The Law of Oil and Gas* (1989); Richard W. Hemingway, *Law of Oil and Gas* (3d ed. 1991); and John S. Lowe, *Oil and Gas Law* (3d ed. 1995).

being held under other provisions of the lease. In addition, the majority position implicitly requires marketing as well as extraction, especially where gas is concerned. For example, in both *Stanolind Oil & Gas Co. v. Barnhill* (Tex. Civ. App. 1937), 107 S.W.2d 746, and *Cox v. Miller* (Tex. Civ. App. 1944), 184 S.W.2d 323, gas was found in quantities sufficient for paying production, however, no market was available. Consequently, as no physical production was present at the end of the primary term, the courts in those cases held that the leases had terminated under the particular provisions of the habendum clauses at issue.

¶33    The minority view holds that an oil and gas lease will not terminate if oil or gas is *discovered* prior to the end of the primary term. In those jurisdictions that hold to the minority view, extraction is not necessary to preserve the lease, although "discovery" requires completion and capability of extraction and the lessee must make diligent efforts to market. For example, in *Bristol v. Colorado Oil & Gas Corp.* (10th Cir. 1955), 225 F.2d 894, a gas well in Oklahoma was shut in following the primary term for almost eight years prior to the securing of a market. The court in *Bristol* held that under the provisions of the lease in that case, the lease had not terminated. The court also concluded that the lessee had used extraordinary diligence in securing a market. One of the factors the court considered in making this determination was that the well was over twenty miles from the nearest pipeline. *Bristol*, 225 F.2d at 897-98.

¶34    A literal construction of the term "production" in an oil and gas lease would mean that small amounts of production would suffice to extend the lease indefinitely. With a few exceptions however, the courts that have considered the issue have concluded that

13

production must be "in paying quantities" to the lessee.[3]  The rationale for this is that many modern oil and gas leases have an indefinite secondary term to avoid the problem of termination at the end of some arbitrarily fixed term while it is still profitable to produce the leased property.  From the viewpoint of both lessees and lessors, the lease is an economic transaction.  When it no longer is profitable, a lease should terminate.  Otherwise, lessees would be permitted to speculate with lessors' interests.

¶35  "Production in paying quantities" is usually defined as that quantum of production that would return a profit to the lessee, however small, over lifting or production costs, even though the cost of drilling and equipping the well might never be repaid.  The majority view is that some element of profit to the lessee would be required, and as so defined the term "production" was equated to "paying production" or "production in paying quantities." Lifting and production costs are the costs of producing the well and do not include costs of drilling, completing or equipping the well.  Whether or not the well may ultimately pay out its costs of drilling and completing are not considered.

¶36  It is common for a well to be completed and ready for production but shut in waiting for a market.  Since, the majority view is that a lease terminates at the end of the primary term unless there is actual extraction and marketing, even though there is a capability of production, most modern oil and gas leases contain a shut-in royalty clause providing that the lease will be maintained if a well capable of producing is shut in.  A shut-in royalty

---

[3]  In Kentucky, production need not be in paying quantities, but must be in such quantities as is susceptible of division so as to pay the lessor a royalty even though the royalty may be small. *Enfield v. Woods* (Ky. 1923), 248 S.W. 842.

14

clause provides for "constructive production," typically in the form of shut-in royalty payments. The effect of the shut-in royalty clause is to provide for a substitute for production under the habendum clause.

¶37 In Montana, this Court has repeatedly held with the minority view. In *Steven v. Potlatch Oil & Ref. Co.* (1927), 80 Mont. 239, 260 P. 119, this Court determined that *discovery* of gas within the primary term was sufficient to continue the lease and that extraction was not necessary where there was no present market. Similarly, in *Fey v. A.A. Oil Corp.* (1955), 129 Mont. 300, 285 P.2d 578, this Court held that where the lessees brought in a gas well *capable of producing gas* in marketable quantities, they did not forfeit their lease if they did not extract and market the gas when there was no profitable market.

¶38 Most recently, in *Christian v. A.A. Oil Corp.* (1973), 161 Mont. 420, 428, 506 P.2d 1369, 1373, this Court differentiated between the production of oil and the production of gas because of the characteristics of producing gas and that the "product of a gas well can only be transported to a market when the volume and pressure are sufficient." Here, the Court stated:

> Ordinarily, the mere discovery of oil and gas is not sufficient under a lease continuing . . . for "as long thereafter as oil or gas is produced." The oil or gas must be withdrawn from the land and reduced to possession for use in commerce, especially where the real consideration for the lease is the proceeds.

*Christian*, 161 Mont. at 428, 506 P.2d at 1373. However, since the Court in *Christian* was dealing only with gas producing wells, the Court determined that the *discovery* of gas in

15

commercial quantities during the primary term satisfied the provisions of the habendum clause for a period of time and thereby extended the lease into the secondary term. The Court also determined that the lessee is required to use reasonable diligence in operating the well and marketing the product within a reasonable time and that failure to do so will result in termination of the lease under the habendum clause after the expiration of the primary term. *Christian*, 161 Mont. at 428-29, 506 P.2d at 1373-74.

¶39    Consequently, although a majority of jurisdictions would disagree, in Montana, drilling a gas well which is completed and immediately shut in *is* considered "production" or "a producing well" and will propel the lease past the primary term and into the secondary term under the habendum clause. Thereafter, the lease will continue as long as the lessee uses reasonable diligence in marketing the gas.

¶40    In the case *sub judice*, there was no question that gas was discovered on the leased lands during the primary term. In its complaint, Sandtana admitted that the well in Section 19 was a gas well "capable of production," but that it was shut in due to the lack of a pipeline from the well to a gathering system. In addition, one of the exhibits attached to the Wallin group's Reply Brief in Support of its Motion for Summary Judgment included a "Well Drilling Report" that showed that the well in Section 19 produced gas to the surface on September 8, 1999, the last day of the primary term. Hence, based on the previous discussion, the well in Section 19 was "a producing well."

¶41    Consequently, but for the Pugh clauses, the leases would have been extended on all of the leased lands because there was production in one section. However, the Pugh clauses,

16

upon expiration of the primary term, segregated the leased lands into producing and nonproducing sections and required that annual rentals be paid on or before the expiration of the primary term in order to perpetuate the lease as to all nonproducing sections. Thus, pursuant to the language of the Pugh clauses, production did not extend the primary term of the leases, except as to the governmental section in which the producing well is located--i.e., Section 19. Therefore, under the leases at issue here, the only way to extend them beyond the primary term on any governmental section that did not contain a producing well was by tendering annual rentals on or before the expiration of the primary term.

¶42    Accordingly, we hold that the District Court was correct in determining that the Pugh clauses added to the subject oil and gas leases required that rentals be paid on or before the expiration of the primary term in order to extend the leases as to undeveloped sections.

**Issue 2.**

¶43    *Whether the District Court erred in determining that Sandtana's late tender of rentals caused the subject oil and gas leases to terminate as to all undeveloped sections.*

¶44    We determined in the previous issue that a producing well had been drilled in Section 19 of the leased lands thereby requiring, under the Pugh clauses, that annual rentals be paid on all of the leased lands outside of Section 19 in order to extend the leases on those lands beyond the primary term. It is undisputed that the annual rentals were not paid until two days after the primary term ended.

¶45    It has long been the dominant rule in Montana (and other producing states) that time is of the essence in oil and gas leases, and failure to pay rentals on time results in immediate and automatic termination of the lease. *See Clawson v. Berklund* (1980), 188 Mont. 48, 53,

17

610 P.2d 1168, 1171. Consequently, because Sandtana failed to pay rentals in a timely manner, Sandtana's leases expired by their own terms as to all of the leased lands except Section 19.

¶46 Accordingly, we hold that the District Court was correct in determining that Sandtana's late tender of rentals caused the subject oil and gas leases to terminate as to all undeveloped sections.

¶47 Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ JIM REGNIER

/S/ PATRICIA COTTER

/S/ W. WILLIAM LEAPHART