No. 04-547

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 162N

CARTER STEWART,

       Plaintiff and Appellant,

  v.

JOHN S. HAUPTMAN and
INTERMOUNTAIN LEASING, INC.,

       Defendants and Respondents.

APPEAL FROM:    The District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV 2002-766,
Honorable Russell C. Fagg, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

       Mark T. Errebo, Attorney at Law, Billings, Montana

       For Respondents:

       James P. Healow, Attorney at Law, Billings, Montana

Submitted on Briefs:  February 23, 2005

Decided:  July 10, 2007

Filed:

_____
                Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, as amended in 2003, the following decision shall not be cited as precedent. It shall be filed as a public document with the Clerk of the Supreme Court and its case title, Supreme Court cause number and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Carter Stewart appeals a Judgment of the District Court for the Thirteenth Judicial District, Yellowstone County, finding in favor of John Hauptman and Intermountain Leasing, Inc., (jointly "Intermountain") regarding certain oil and gas leases in Roosevelt County, Montana. Stewart also appeals the court's Order and Decision denying Stewart's Motion for New Trial.

¶3 Stewart raises the following issues on appeal:

¶4 1. Did the District Court err in holding that Stewart is required to offer all subsequently acquired oil and gas leases to Intermountain under the "Area of Mutual Interest" provision of the Participation/Farmout Agreement?

¶5 2. Did the District Court err in requiring Stewart to specifically perform the March 13, 1995 Agreement between the parties?

¶6 3. Did the District Court err in denying Stewart's motion to take additional testimony with regard to newly discovered evidence pursuant to M. R. Civ. P. 52(b) and 59(a)?

**Factual and Procedural Background**

2

¶7    In early 1995, Stewart, a geologist, approached Hauptman, a petroleum landman, about an oil and gas prospect in Roosevelt County. Stewart asked Hauptman to put up some of the money for the leases. Hauptman obtained the leases from the mineral owners under the name Intermountain. Subsequently, Dennis Rue and Neal LaFever also contributed money for the leases.

¶8    Stewart, Intermountain, Rue and LaFever entered into an Agreement regarding the ownership of the oil and gas leases in the North Shotgun Creek Prospect in Roosevelt County on March 13, 1995. This Agreement provided that the four would own the leasehold interests already acquired and "any oil and gas leases and leasehold estates which may be subsequently acquired." Three wells were eventually drilled on these leases.

¶9    On August 15, 1995, Intermountain, as operator of the wells, prepared and executed a Participation/Farmout Agreement (P/FA).[1] Although Stewart did not sign the P/FA, Intermountain claimed that Stewart was bound by its terms because Intermountain, as holder of the leases, had executed the P/FA as Stewart's agent and trustee. The P/FA included an "Area of Mutual Interest" (AMI) provision which required each party to offer any subsequently acquired leases in the North Shotgun Creek Prospect to the other parties at acquisition cost. Intermountain claimed that the interests of the parties under the original March 13, 1995 Agreement were transferred, redefined and refined by the P/FA.

¶10   In 1998, Intermountain reacquired a number of the North Shotgun Creek Prospect

---

[1] The parties occasionally refer to this as the September 15, 1995 P/FA, however, it is actually dated August 15, 1995.

leases which had expired, and assigned interests in those leases pursuant to the P/FA. In February 2000, Stewart reacquired seven leases in the North Shotgun Creek Prospect and indicated his intent to share interests in those leases with Rue and LaFever, but not with Intermountain. To that end, Stewart wrote a letter to Rue and LaFever with the salutation "Dear Partners." A well was subsequently drilled on these leases.

¶11 Intermountain filed an affidavit with the Clerk and Recorder of Roosevelt County on May 1, 2002, in which Intermountain claimed an interest in the oil and gas leases acquired by Stewart. Stewart alleged that, as a result of the filing of the affidavit, title to the well was clouded and the producer refused to pay Stewart his share of the proceeds of the well.

¶12 On October 15, 2002, Stewart filed an Amended Complaint and Jury Demand against Intermountain alleging that he was damaged by Intermountain's actions in filing the affidavit. Stewart sought an order requiring Intermountain to rescind the affidavit and thereby remove the cloud from the title so that Stewart could receive his share of the proceeds from the well. Stewart also sought damages for deceit, libel and interference with contract.

¶13 In its Amended Answer, Intermountain claimed that Stewart was bound by the P/FA because: (1) Intermountain had executed it on Stewart's behalf pursuant to their joint venture in the North Shotgun Creek Prospect in Roosevelt County; (2) Stewart accepted the benefits of the P/FA; and (3) by accepting assignments of the 1998 leases from Intermountain, Stewart impliedly consented to be bound by the P/FA. Intermountain further claimed that Stewart was bound by the AMI provision which

4

required Stewart to allow Intermountain to participate in Stewart's oil and gas leases. Intermountain sought a judgment declaring that the AMI provision was applicable to Stewart's leases and that Stewart was required to specifically perform his obligations under the AMI provision.

¶14 The case was tried before the District Court without a jury on September 22 and 23, 2003. On October 7, 2003, the court issued its Findings of Fact and Conclusions of Law wherein the court determined that Intermountain owns a 1/6 interest in the seven leases acquired by Stewart. The court also determined that Stewart was entitled to reimbursement for his time and costs in procuring said leases.

¶15 On October 23, 2003, Stewart moved for a new trial on the grounds that he had discovered new evidence. Specifically, he contended that he discovered a letter from Hauptman dated March 8, 2000, which is in "direct contravention of defendant Hauptman's testimony at trial and paragraph 16 of the Findings of Fact issued by the Court on October 7, 2003." In an Order and Decision entered December 1, 2003, the District Court denied Stewart's Motion for New Trial on the basis that the evidence was not "newly discovered" as Stewart claimed and the evidence did not directly contravene Hauptman's testimony or the court's Finding of Fact No. 16.

¶16 On March 23, 2004, the court entered Judgment for Intermountain and against Stewart declaring that the P/FA dated August 15, 1995, and particularly the AMI provision, was applicable to any leases acquired by Stewart within the North Shotgun Creek Prospect for so long as any of the oil and gas leases subject to the P/FA continued in effect, whether by production, extension or otherwise. The court also ordered that

5

Stewart specifically perform the provisions under the March 13, 1995 Agreement, as well as the P/FA, and allow Intermountain to participate under those agreements after Intermountain has paid its share of expenses incurred in procuring the leases.

¶17 Stewart appeals. Intermountain did not file a response brief until more than a year after the time for filing such brief had expired. Stewart moved to disregard Intermountain's untimely brief and this Court so ordered.

**Issue 1.**

¶18 *Did the District Court err in holding that Stewart is required to offer all subsequently acquired oil and gas leases to Intermountain under the AMI provision of the P/FA?*

¶19 Stewart maintains on appeal that he is not bound by the P/FA because he did not sign it and, even if it is determined that he was bound by the P/FA, he was not required to offer the subsequently acquired leases to Intermountain pursuant to the AMI provision of the P/FA because the Operating Agreement attached to the P/FA states that leases acquired more than six months after the expiration of an existing lease are not subject to the P/FA.

¶20 In construing an oil and gas lease, courts will generally apply the rules of contract interpretation. *Sandtana, Inc. v. Wallin Ranch Co.*, 2003 MT 329, ¶ 26, 318 Mont. 369, ¶ 26, 80 P.3d 1224, ¶ 26. The construction and interpretation of a contract is a question of law for the court to decide. *Ophus v. Fritz*, 2000 MT 251, ¶ 19, 301 Mont. 447, ¶ 19, 11 P.3d 1192, ¶ 19 (citing *Schwend v. Schwend*, 1999 MT 194, ¶ 36, 295 Mont. 384, ¶ 36, 983 P.2d 988, ¶ 36; *Stutzman v. Safeco Ins. Co. of America*, 284 Mont. 372, 376, 945 P.2d 32, 34 (1997)). We will review a district court's conclusions of law for correctness.

6

*Ophus*, ¶ 19 (*Schwend*, ¶ 36; *Carbon County v. Union Reserve Coal Co., Inc.*, 271 Mont. 459, 469, 898 P.2d 680, 686 (1995)).

¶21 Here, the March 13, 1995 Agreement "set forth the understanding and agreement by and among" Intermountain, Stewart, LaFever, and Rue "regarding the North Shotgun Creek Prospect in Roosevelt County, Montana" and was signed by all four parties. This Agreement stated:

> WHEREAS, it is the desire of the parties hereto to define and stipulate the proportionate interest owned by each in the oil and gas leases and leasehold estates described in Exhibit "A" and provide for the sharing [of] all prospect fees, revenues, costs, expenses and liabilities attributable thereto *and any oil and gas leases and leasehold estates which may be subsequently acquired.* [Emphasis added.]

¶22 In 1998, Intermountain reacquired a number of the North Shotgun Creek leases which had expired, and assigned interests in those leases. The District Court determined that by virtue of the P/FA, Stewart received the benefit of an assignment of those leases and that, having accepted the benefits of the agreement, Stewart is deemed to have given his implied consent to the P/FA. Moreover, subsequent to execution of the agreement, Stewart accepted at least five different assignments from Intermountain: three assignments of royalty; an assignment of the original oil and gas leases; and an assignment of the 1998 reacquired leases. These various assignments each included provisions expressly making the assignments subject to the P/FA.

¶23 The "Assignment of Overriding Royalty" executed by Hauptman as President of Intermountain Leasing, Inc., on May 1, 1998, "but effective December 10, 1995," assigned 25% royalties to all four participants in the North Shotgun Creek Prospect:

7

Stewart, Rue, LaFever and Hauptman. This document stated:

> This assignment is subject to the terms and conditions of the oil and gas leases and *is expressly made subject to the following*:
> A. *That certain Participation/Farmout Agreement ("Agreement") effective August 15, 1995*, covering the Oil and Gas Leases described in Exhibit "A" by and among Intermountain Leasing, Inc., . . . Stewart Geological, Inc., Dennis J. Rue, Neal LaFever . . . , the terms and conditions of which shall be applicable, whether or not specifically recited herein. [Emphasis added.]

¶24 Two other "Assignment[s] of Overriding Royalt[ies]" were also executed on May 1, 1998, one indicating an effective date of December 10, 1995, and the other indicating an effective date of December 10, 1996. Both assignments contained the same information quoted above regarding the applicability of the P/FA.

¶25 In addition, a document entitled "Assignment of Oil and Gas Leases" was executed by Hauptman as President of Intermountain Leasing Inc., on May 30, 1997, "but effective as of December 1, 1995." This document assigned to Rue, LaFever and Stewart their respective interests in the leases specified therein, and contained the information quoted above regarding the P/FA.

¶26 Stewart admitted on cross examination that he was not a record owner of the leaseholds until he received an assignment from Intermountain. He also admitted that during the time prior to the assignment, Intermountain held Stewart's interests for his benefit.

¶27 Based on the foregoing, we hold that by accepting the benefit of the assignments under the P/FA, Stewart bound himself to the P/FA. Section 28-2-503(2), MCA ("A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the

8

obligations arising from it, so far as the facts are known or ought to be known to the person accepting.")

¶28 Nevertheless, Stewart maintains that even if he is bound by the P/FA, he was not required to offer the subsequently acquired leases to Intermountain pursuant to the P/FA. Stewart hinges his argument on Article VIII.B. of the Model Form Operating Agreement (Operating Agreement). The Operating Agreement is attached to the P/FA as Exhibit "C" and provides as follows:

> Any renewal or replacement Lease taken before the expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time the renewal or replacement Lease becomes effective; *but any Lease taken or contracted for more than six (6) months after the expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this agreement.* [Emphasis added.]

¶29 The District Court determined, and we agree, that the AMI overrides the language of Article VIII.B. of the Operating Agreement because of the conflict between the two. The P/FA states at ¶ 8: "In the event of a conflict between the terms of this agreement and those of the Operating Agreement, this Agreement shall prevail." Moreover, Stewart himself acted as though the six-month provision of Article VIII.B. of the Operating Agreement did not apply to his newly acquired leases when he executed and delivered to all of the North Shotgun Creek Prospect participants, except Intermountain, assignments of those leases in their previous percentages via a letter with the salutation "Dear Partners."

¶30 The AMI, which is set forth in ¶ 10 of the P/FA, provides: "The parties hereto

9

create between themselves, *for so long as any of the oil and gas leases subject hereto are continued in force* as to any part, whether by production, extension or otherwise, an Area of Mutual Interest covering lands in Roosevelt County, Montana . . . ." This paragraph further provides: "It being understood and agreed that any subsequently acquired lease (hereinafter "AMI" Interest) acquired by any of the parties hereto shall be offered to all such parties at the actual acquisition costs of the offering party . . . ." In February 2000, when Stewart acquired the leases at issue here, there were at least eleven other leases in the North Shotgun Creek Prospect still "in force," hence Stewart was contractually and legally required to offer the leases to Intermountain as well as the other participants in the North Shotgun Creek Prospect.

¶31   Accordingly, we hold that the District Court did not err in holding that Stewart was required to offer all subsequently acquired oil and gas leases to Intermountain under the AMI provision of the P/FA.

**Issue 2.**

¶32   *Did the District Court err in requiring Stewart to specifically perform the March 13, 1995 Agreement between the parties?*

¶33   In its March 23, 2004 Judgment, the District Court ordered that Stewart specifically perform the provisions under the March 13, 1995 Agreement, as well as the P/FA, and allow Intermountain to participate under those agreements after Intermountain has paid its share of expenses to be able to participate.

¶34   Stewart contends on appeal that the District Court erred in ordering that he specifically perform the March 13, 1995 Agreement because that issue was never pled

10

and there was never any evidence supporting that claim offered at trial. Although Stewart is correct that Intermountain did not plead specific performance of the March 13, 1995 Agreement in its Amended Answer, the Pretrial Order, signed by counsel for both parties, set forth the following Issues of Fact:

> 9. Whether [Intermountain is] entitled to a judgment declaring that the March 13, 1995 Agreement applies to Stewart's subsequently acquired leasehold.
> 10. Whether [Intermountain is] entitled to *specific performance of* the AMI language of the Participation/Farmout Agreement and/or *the March 13, 1995 Agreement*. [Emphasis added.]

¶35 M. R. Civ. P. 16(e) provides that a pretrial order controls the subsequent course of the action unless modified by a subsequent order. "The purpose of pretrial orders is to prevent surprise, simplify the issues and permit counsel to prepare their case for trial on the basis of the pretrial order." *Zimmerman v. Robertson*, 259 Mont. 105, 111, 854 P.2d 338, 342 (1993) (citing *Workman v. McIntyre Const. Co.*, 190 Mont. 5, 617 P.2d 1281 (1980)). This Court has often held that parties may not assert issues or other matters which were not included in the pretrial order. *Travelers Indem. Co. v. Andersen*, 1999 MT 201, ¶ 34, 295 Mont. 438, ¶ 34, 983 P.2d 999, ¶ 34 (citations omitted).

¶36 In the case *sub judice*, not only was the issue of specific performance of the March 13, 1995 Agreement included in the Pretrial Order, but that order itself declared:

> IT IS HEREBY ORDERED that *this pre-trial* [sic] *order shall supersede the pleadings and govern the course of the trial of this cause*, unless modified to prevent manifest injustice.
> IT IS HEREBY ORDERED that *all pleadings herein shall be amended to conform to this pretrial order*. [Emphasis added.]

Moreover, the March 13, 1995 Agreement was admitted as an exhibit in the trial in this

11

matter, and counsel for both parties spent a considerable amount of time eliciting testimony as to the significance of that Agreement.

¶37    Consequently, pursuant to both the terms of the Pretrial Order and *Zimmerman,* the issue of specific performance of the March 13, 1995 Agreement was properly before the District Court at trial and before this Court on appeal.

¶38    Accordingly, we hold that the District Court did not err in requiring Stewart to specifically perform the March 13, 1995 Agreement between the parties.

## Issue 3.

¶39    *Did the District Court err in denying Stewart's motion to take additional testimony with regard to newly discovered evidence pursuant to M. R. Civ. P. 52(b) and 59(a)?*

¶40    Shortly after trial and before the District Court entered judgment in this case, Stewart moved for a new trial pursuant to M. R. Civ. P. 59(a) and § 25-11-103, MCA, claiming that he had newly discovered evidence.  This evidence was a letter from Hauptman which Stewart claimed directly contravened Hauptman's testimony at trial and the District Court's Finding of Fact No. 16.  In addition, in reply to Hauptman's brief in opposition to the Motion for New Trial, Stewart requested that, rather than granting an entirely new trial, the court reopen the case under M. R. Civ. P. 52(b) for the limited purpose of admitting and considering the letter prior to rendering judgment.  The District Court denied Stewart's motion on the grounds that the evidence was not newly discovered, nor did it directly contravene Hauptman's testimony or the court's Finding of Fact No. 16.

¶41    We review a district court's decision to grant or deny a new trial based upon

12

newly discovered evidence for a manifest abuse of discretion. *Groves v. Clark*, 1999 MT 117, ¶ 32, 294 Mont. 417, ¶ 32, 982 P.2d 446, ¶ 32 (citing *Fjelstad v. State, Through Dept. of Highways*, 267 Mont. 211, 220, 883 P.2d 106, 111 (1994)). We stated in *Groves*, that

> [a] party moving for a new trial on the basis of newly discovered evidence must show that: (1) this evidence came to the party's knowledge since the trial; (2) it was not through want of diligence that the evidence was not discovered earlier; (3) the evidence is so material that it would probably produce a different result upon retrial; (4) the evidence is not merely cumulative; and (5) the evidence does not tend only to impeach the character or credit of a witness.

*Groves*, ¶ 33 (citing *In re Marriage of Neal*, 267 Mont. 455, 461-62, 884 P.2d 789, 793-94 (1994)).

¶42 Stewart attested in his affidavit accompanying his Motion for New Trial that he found the letter amongst his own papers and that it had been in his possession for 3½ years. Hence, although Stewart had forgotten about the letter, he has not shown that it only came to his knowledge since the trial, nor has he shown that he could not have "discovered" the letter and produced it at trial with reasonable diligence.

> "Where the moving party in a motion for new trial on the ground of 'newly discovered' evidence has had the books and documents in his possession, from which he later 'discovers' the 'new evidence,' the motion will be denied, even though the evidence itself may be material."

*In re Marriage of Burner*, 246 Mont. 394, 396, 803 P.2d 1099, 1100 (1991) (quoting *Kartes v. Kartes*, 175 Mont. 210, 215, 573 P.2d 191, 194 (1977)).

¶43 We conclude that the letter in question was not "newly discovered" evidence. Therefore, we hold that the District Court did not abuse its discretion in denying

Stewart's Motion for New Trial.

¶44     Affirmed.


                                    /S/ JAMES C. NELSON


We Concur:

/S/ KARLA M. GRAY
/S/ BRIAN MORRIS
/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER
/S/ PATRICIA COTTER
/S/ JIM RICE